UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CIVIL ACTION NO. 6:08-CV-02120-ACC-GJK

BABY ROBERTA SOLIS BAMERT,

Plaintiff,

vs.

PULTE HOME CORPORATION, a Michigan
Corporation,

Defendant.

_____/

CONSOLIDATED WITH:

6:13-CV-264-ORL-22GJK
6:13-CV-265-ORL-22GJK
6:13-CV-266-ORL-22GJK
6:13-CV-267-ORL-22GJK
6:13-CV-268-ORL-22GJK
6:13-CV-269-ORL-22GJK
6:13-CV-270-ORL-22GJK
6:13-CV-271-ORL-22GJK
6:13-CV-272-ORL-22GJK
6:13-CV-273-ORL-22GJK
6:13-CV-274-ORL-22GJK
6:13-CV-275-ORL-22GJK
6:13-CV-276-ORL-22GJK
6:13-CV-277-ORL-22GJK
6:13-CV-278-ORL-22GJK
6:13-CV-279-ORL-22GJK
6:13-CV-280-ORL-22GJK
6:13-CV-281-ORL-22GJK
6:13-CV-282-ORL-22GJK
6:13-CV-283-ORL-22GJK
6:13-CV-284-ORL-22GJK

## PLAINTIFF'S OPPOSITION TO PULTE'S MOTION TO DISMISS

Pulte's Motion to Dismiss [DE 161] the Third Amended Complaint ("TAC") should be denied. The TAC sufficiently states claims for securities fraud against Pulte based upon its own fraudulent statements, omissions and practices, and based upon those of its agent Wear/TWC, in violation of § 10b of the Securities Exchange Act Of 1934, 15 U.S.C. § 78j(B), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiff has satisfied the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure, and of the PSLRA, 15 USC §§ 78u-4(b)(1), (2). Therefore, the motion to dismiss Plaintiff's claims for securities fraud should be denied.

Furthermore, genuine issues of material fact regarding the application of the statute of limitations to Plaintiff's claim for sale of unregistered securities in violation of §12 of the Securities Act of 1933, 15 U.S.C. §77l(a)(1) and (2) preclude dismissal. The accrual date of the statute of limitations for the sale of an unregistered security in this case cannot be determined on

the pleadings alone. Therefore, the motion to dismiss the Plaintiff's claim for sale of an unregistered security should be denied for this reason as well.

I.    **The TAC Sufficiently States a Claim for Securities Fraud**

The Magistrate Judge's Report and Recommendation dated June 11, 2012 entered at DE 114, affirmed by the District Court on August 10, 2012 in its Order entered at DE 122, provided a guide to Plaintiff for amendment of the prior complaint. At pages 12-13 the Magistrate Judge instructed:

> To state a claim under Section 10 or Rule 10b-5, a plaintiff must allege: 1) the existence of a material misrepresentation (or omission) by the defendant; 2) made with scienter; 3) a connection between the material misrepresentation or omission and the purchase or sale of a security; 4) reliance upon the misrepresentation or omission by the plaintiff; 5) economic loss by the plaintiff; and 6) loss causation between the material misrepresentation or omission and the plaintiff's economic loss. Pursuant to Rule 9(b), Federal Rules of Civil Procedure, "[b]ecause Rule 10b-5 sounds in fraud, the plaintiff must plead the elements of its violation with particularity."  As to Rule 9(b), the Eleventh Circuit has held that it "does not require a plaintiff to allege specific facts related to the defendant's state of mind when the allegedly fraudulent statements were made." Thus, under Rule 9(b), scienter could be alleged generally.

The Plaintiff has followed these instructions. The TAC contains the following allegations in general terms on all six of these factors:

| Element of claim under Sec. 10 or Rule 10b-5 | Complaint Sections | Paragraphs |
|---|---|---|
| 1) the existence of a material misrepresentation (or omission) by the defendant | V., V.A., V.B., V.C., V.D., V.E., VI., VI.A., VI.B., VI.C., VIII. | *passim* |
| 2) made with scienter | VI.D. | ¶¶ 73-85 |
| 3) a connection between the material misrepresentation or omission and the purchase or sale of a security | VI.E., VIII. | ¶¶ 86-101, 109-123 |
| 4) reliance upon the misrepresentation or omission by the plaintiff | VI.E., VIII. | ¶¶ 86-101, 109-123 |
| 5) economic loss by the plaintiff | VI.E., VIII. | ¶¶ 86-101, 109-123 |
| 6) loss causation between the material misrepresentation or omission and the plaintiff's economic loss | VI.E., VIII. | ¶¶ 86-101, 109-123 |

The TAC contains extensive detail regarding every aspect of the securities fraud. The TAC begins by defining the term "INVESTMENT CONTRACTS" as follows:

> The term "INVESTMENT CONTRACTS" as used herein means the investment program and scheme consisting of the exclusive rental agreements with OMC combined with the condominium purchase from PULTE, up to three years of effortless ownership and up to 36 months of no payments, assurances of substantial passive income from short-term rentals, valuable incentives and special financing through the "Pulte Rewards Program," active management of the property, a hotel rental program, and promises of significant appreciation in value, which formed a single scheme under which Plaintiffs were left with no significant control over their investment.

TAC ¶ 17.  The TAC goes on to allege facts that apply to all investors who purchased INVESTMENT CONTRACTS, including the plaintiff in the instant case, as well as facts that apply specifically and only to the instant plaintiff. Section V. of the TAC makes allegations common to all investors, **including the plaintiff in the instant case**. Section VI. makes specific allegations of misrepresentations, omissions and fraudulent practices common to all investors, **including the plaintiff in the instant case.** Section VIII. makes specific allegations showing "who, what, when, where and how" the misrepresentations, omissions and fraudulent practices were made **to the specific plaintiff in the instant case**.

The Plaintiff has satisfied Rule 9(b) by setting forth the "who, what, when, where and how" of the alleged fraud. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008). The TAC complies with the PSLRA by specifying each misleading statement and the particular facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 USC §§ 78u-4(b)(1), (2). The TAC complies with the PSLRA requirement that the plaintiff allege defendants' misrepresentations "caused the loss for which the plaintiff seeks to recover." § 78u-4(b)(4). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345-346 (U.S. 2005).

Even though "a plaintiff need not allege the fraud in novelistic detail," *Trilogy Properties, LLC v. SB Hotel Assoc. LLC*, 2010 U.S. Dist. Lexis 143725 at *23 (S.D. Fla. 2010), *citing Seville Indus. Mach. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984), Plaintiff has gone to great lengths to allege specific instances of fraud. Even though "Rule 9(b) must not be read to abrogate rule 8 . . . and a court considering a motion to dismiss for failure to plead fraud with particularity should always be careful to harmonize the directives of rule 9(b) with the broad-

er policy of notice pleading," *Friedlander v. Nims*, 755 F.2d 810, 813 n. 3 (11th Cir. 1985), Plaintiff has complied with Rule 9(b) in all respects.

### a. **Wear and TWG are Pulte's Common Law Agents**

In its decision reversing the district court's dismissal of the amended complaint in this case, the Eleventh Circuit recognized that "Plaintiffs have alleged sufficient facts to render it facially plausible that Pulte participated in promoting, or was affiliated with, the rental pool so that **an agency relationship was therefore present**." *Bamert v. Pulte Home Corp.*, 445 Fed. Appx. 256 at * 24 (11th Cir. 2011)(emphasis added). The Court also determined that "Plaintiffs have succeeded in pleading enough facts to make it plausible, despite the numerous disclaimers in Pulte's purchase agreements, that **Pulte was linked to the other defendants in the promotion of the properties as investment opportunities.**" *Id.* at 266 (emphasis added). The allegations of an agency relationship between Pulte and Wear/TWG for securities fraud liability have only increased in strength in the TAC.[1]

Pulte's opposition rests on a false premise, namely that Pulte cannot be charged with violations of Section 10(b) or 10b-5 based upon statements made by Pulte's agents Wear/TWG. This is incorrect and contrary to the law of the case in this action. As noted above, the Eleventh Circuit held explicitly that Pulte is liable for the statements of Wear/TWG based upon traditional principles of agency because a principal/agent relationship was present. Therefore, since the TAC alleges an agency relationship existed between Wear/TWG, Pulte's argument that it cannot be liable for the misrepresentations of its agent must be rejected.

Furthermore, traditional agency principles have always applied to securities fraud claims. Time and again common law principles of agency have been applied to hold a principal liable for the fraud of his agent in the sale of securities. *See, LaPerriere v. Vesta Insur. Group, Inc.*, 526 F.3d 715, 725 (11th Cir. 2008); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d

---

[1] On November 2, 2012, Plaintiff took the deposition of former defendant James J. Murphy.  Mr. Murphy testified that he had three meetings with three different vice president level Pulte executives at Pulte's Orlando regional office during which the INVESTMENT CONTRACTS were discussed. Murphy Depo. at 78-90 attached as Exhibit A. Murphy testified that these three Pulte executives were aware of the investment scheme being promoted by Wear/TWG as Pulte's agents, including OMC's participation as exclusive rental agent. Murphy Depo. At 85.  The deposition of Murphy has provided significant additional facts to support the claims of all the investors, including the claims of the instant plaintiff.

1111 (5th Cir. 1980). *See also, In re Atlantic Fin. Management, Inc.*, 784 F.2d 29, 32-34 (1st Cir. 1986); *Commerford v. Olson*, 794 F.2d 1319, 1322-23 (8th Cir. 1986); *Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 712-16 (2d Cir. 1980); *Holloway v. Howerdd*, 536 F.2d 690, 694-95 (6th Cir. 1976); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990); *Kerbs v. Fall River Indus., Inc.*, 502 F.2d 731, 740-41 (10th Cir. 1974).

### b. *Janus* Does Not Apply

Pulte misreads the Supreme Court's decision in *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011). The facts in *Janus* are the polar opposite of the facts here. Here, plaintiffs seek to hold the **principal liable for the statements of its authorized agent** under traditional common law agency principles. In *Janus*, the plaintiff sought to hold the **agent liable for the statements of the principal**. *Janus* is the opposite of the case at bar.

*Janus* raised the narrow question whether a mutual fund investment adviser could be held liable as a controlled person for false statements included in mutual fund prospectuses provided by a separate and distinct entity. *Id.*, 131 S.Ct. at 2299. *Janus* held that agents are not liable as aiders or abettors for fraudulent statements made by a controlling person under section 20(a) of the Securities Act of 1934, 15 U.S.C. § 78t. The Court held that although the advisor played a role in preparing and disseminating the prospectuses, the advisor did not have ultimate authority over the statements, and thus did not "make" the statements. *Id.* at 2303, 2305.

Liability under § 20(a) is not equivalent to liability under common law rules of agency. *See In re Villa*, 261 F.3d 1148, 1152 (11th Cir. 2001), *citing Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111 (5th Cir. 1980). Liability under section 20(a) was intended to supplement, not to supplant the common law theory of *respondeat superior* as a basis for vicarious liability. *See LaPerriere* , 526 F.3d at 725. "[T]hus, section 20(a) does not constitute an exclusive substitute for the vicarious liability of secondary actors that might otherwise exist under common law agency principles." *Id*.

### c. The TAC Alleges Facts Demonstrating Agency

The TAC alleges facts demonstrating the existence of a common law agent/principal relationship between Wear/TWG and Pulte. Wear/TWG was the selling real estate broker on every single investment made by plaintiffs, including the Plaintiff Bamert's. TAC ¶¶ 15, 118.

Wear/TWG repeatedly hyped their connection with Pulte, often referring to it as a "joint venture." TAC ¶ 28.

"The essence of a joint venture is an agreement between the parties." *Cannova v. Carran,* 92 So. 2d 614, 620 (Fla. 1957). The agreement between parties to a joint venture is understood to be an agreement between principal and agent.

> Liability of one member of a joint enterprise for the acts of another is a vicarious liability founded upon the relationship that has arisen between the parties *ex contractu*; it springs from the operation of law upon the practical relationship into which the parties have voluntarily brought themselves by contract and is largely governed by principles analogous to those applicable to partnership and agencies.

*Metric Eng'g v. Gonzalez*, 707 So. 2d 354, 355 (Fla. Dist. Ct. App. 3d Dist. 1998)(emphasis added). As a result, if the relationship between TWG and Pulte was a "joint venture," then it was also an agency with TWG acting as Pulte's agent.

On the TWG website at www.theweargroup.com, under the heading "Company News," TWG touted in a headline "**Wear Group joins with Fortune 150 builder Pulte Home for Vista Cay.**"

> The Wear Group announced a joint venture with Pulte Homes for Vista Cay, a resort development located in Orlando, Florida, directly adjacent to the 2nd largest convention center in the U.S. 'We are proud to team up with Wear Group Realty, their reputation is outstanding" said a Pulte Representative. Demand in the area is so strong that a well known property management company has offered all investors guaranteed mortgage, tax and HOA payments up to 5 years.

TAC ¶ 28.

A promotional flyer distributed by WEAR and TWG bore the corporate insignias of both TWG and PULTE and stated "[i]nvestments like this come along once in a lifetime. The Wear Group, Pulte Homes (NYSE: PHM) and Osceola Management have teamed up for what could be the best opportunity in history for Real Estate Investors." TAC ¶ 29, 30. The TWG website promised:

> Mortgage payments, taxes, HOA dues, insurance, and furniture leasing package payments are all GUARANTEED for 24 months with an option for renewal annually for up to 5 years. A credit of up to $4,000 will be given to cover utilities for 24 months. Receive up to $6,000 towards closing costs. In order to qual-

ify for this exclusive offer, you must use our preferred lender and loan pro-
gram.

INCENTIVES…WHY WE COULDN'T WAIT! The Wear Group offers you an
all-inclusive incentive package that includes: Mortgage payments, taxes, HOA
dues, insurance, and furniture leasing package payments are all GUARAN-
TEED for 24 months with an option for renewal annually for up to 5 years.  A
credit of up to $4,000 will be given to cover utilities for 24 months.  Receive up
to $6,000 towards closing costs.  *In order to qualify for this exclusive offer, you must
use our preferred lender and loan program.*

TAC ¶ 31 (emphasis added). The reference to *"our preferred lender and loan program"* is a
reference to "Pulte Rewards Program" which was an integral part of the investment
scheme.

TWG was listed as the agent of PULTE on HUD-1 settlement statement forms for each
Pulte sale of a Vista Cay and The Isles unit to the Plaintiffs. TAC ¶ 30.  TWG and WEAR were
paid at least 15% commission from each sale of each INVESTMENT CONTRACT to Plaintiffs,
as well as hefty "marketing fees" and "realtor bonus" fees. *Id*. The purchase contracts be-
tween PULTE and plaintiffs inform purchasers that "[s]eller will pay a commission of 15% +
$30,000 Marketing Fee plus $10,000 Bonus of the purchase price to The Wear Group . . . . **Buy-
er agrees that Broker [TWG] is acting as an agent on behalf of Seller [PULTE].**" *Id*. (Empha-
sis added).

The TAC also contains extensive allegations regarding Pulte's awareness of and
knowledge of Wear/TWG's activities, as well as those of OMC/Murphy, in promoting the sale
of the investment contracts, including that the investment contracts had been approved for
sale by Pulte. TAC, ¶ 45, 46. In particular, paragraph 74 alleges:

At least six (6) separate PULTE employees had knowledge of the sale of the
INVESTMENT CONTRACTS and the use of the MATERIAL MISREPRESEN-
TATIONS, OMISSIONS, and FRAUDULENT PRACTICES, prior to and during
the period of time when the Plaintiffs purchased the INVESTMENT CON-
TRACTS.  Three (3) of the PULTE employees were regional vice presidents and
worked in the PULTE regional office in Orlando.  The names of these three
managerial level employees are currently unknown but will be obtained in dis-
covery.  These three (3) employees met with WEAR and MURPHY at the
PULTE regional office and discussed the INVESTMENT CONTRACTS and
their terms prior to and during the period of time they were sold to Plaintiffs.
Maria Richardson informed Plaintiff GRAVES on or about November 16, 2006
in a conversation at the PULTE sales office at Vista Cay that WEAR had spent

several weeks talking with the "upper management" at PULTE's regional office about the INVESTMENT CONTRACTS, and PULTE management was aware that WEAR was selling units in Vista Cay as an investment.  The other three (3) employees were on-site sales representatives Maria Richardson, Oliver Dommel, and Jason Germaine.  Upon information and belief, there are additional managerial level employees of PULTE who had knowledge of the INVEST-MENT CONTRACTS prior to or during the time they were sold to Plaintiffs.

The TAC alleges Pulte had knowledge that Wear/TWC were acting as Pulte's agents through the six (6) Pulte employees mentioned, the three (3) Pulte on-site sales representatives Maria Richardson, Oliver Dommel, and Jason Germaine, and the three (3) regional vice president level PULTE managers. TAC ¶ 78.  The TAC alleges Pulte was also knowledgeable about the joint venture between Wear/TWG and OMC/Murphy, the features of the INVEST-MENT CONTRACTS offered to Plaintiffs, and that Wear/TWG informed Plaintiffs that PULTE had worked with OMC and TWG to put together the special deal in the INVEST-MENT CONTRACTS offered to Plaintiffs. *Id*.

Taken together, all these allegations demonstrate that Wear/TWG acted as Pulte's common law agent and therefore Pulte is liable for their violations of Section 10(b) and Rule 10b-5 committed in connection with the sales of unregistered securities to plaintiffs.

## II.     The TAC Alleges Fraud with Specificity to Satisfy Rule 9(b) and the PSLRA

Section V. of the TAC begins with specific allegations of the existence of a material misrepresentation (or omission) that apply to all the plaintiffs impacted by Pulte's fraud, including the specific plaintiff in the instant case. Section V. alleges:

| Section | Allegations |
|---|---|
| V. | • Alleges Pulte is a developer under §718.103 F.S. (¶ 12);<br>• Alleges Pulte marketed the sale of units in the development to investors purchasing units to earn rental income (¶¶ 13-15);<br>• Alleges Pulte enlisted Wear/TWG as Pulte's agents to sell units (¶ 14);<br>• Alleges Wear/TWG marketed the units investors seeking passive income (¶ 14);<br>• Alleges OMC/Murphy served as exclusive rental agent (¶ 16). |
| V.A. | • Defines INVESTMENT CONTRACTS (¶ 17);<br>• Alleges facts that make the INVESTMENT CONTRACTS a security (¶¶ 18-22). |
| V.B. | • Alleges the relationship between Wear/TWG and Pulte being |

| Section | Allegations |
|---------|-------------|
| | one of agent/principal (¶¶ 23-32); |
| | • Alleges specific facts supporting the agent/principal relation-ship between Wear/TWG and Pulte (¶¶ 28-32); |
| | • Alleges the complete text of internet websites, emails, bro-chures and flyers where Wear/TWG, as agents of Pulte, made specific misrepresentations to all investors including this plain-tiff (¶¶ 28, 31, 32). |
| V.C. | • Alleges the joint venture between Wear/TWG and OMC/Murphy (¶¶ 33-44); |
| | • Alleges the complete text of the projections of profit made jointly by Wear/TWG and OMC/Murphy to plaintiffs which were misrepresentations made to all investors including this plaintiff (¶ 42). |
| V.D. | • Alleges Pulte's knowledge of the joint venture between Wear/TWG and OMC/Murphy to promote the investments to all investors including this plaintiff (¶¶ 45-48); |
| | • Alleges at least six (6) separate Pulte employees had knowledge of the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES engaged in by Wear/TWC as Pulte's agent, and by Pulte's on-site sales em-ployees (Richardson, Dommel and/or Germaine) and participa-tion in promoting the rental pool to all investors including this plaintiff (¶¶ 45-48). |
| V.E. | • Alleges details of the Pulte Rewards program that was offered to all investors including this plaintiff (¶¶ 49-52). |

**a.  The TAC Alleges Specific Misrepresentations, Omissions and Fraudulent Prac-tices Made to this Plaintiff**

Section VI. of the TAC alleges the specific misrepresentations, omissions and fraudu-lent practices made to this plaintiff. Section VI. sets forth the "what" of the fraud. The "what" are the actual misrepresentations, omissions and fraudulent practices.  Section VI.A. alleges eight (8) separate and specific misrepresentations that were made to this specific plaintiff. The TAC defines these eight misrepresentations as "MATERIAL MISREPRESENTATIONS" for ease of reference. The TAC alleges that the following MATERIAL MISREPRESENTATIONS were made to Plaintiffs by WEAR, TWG and one or more authorized agents of PULTE includ-

ing Maria Richardson, Oliver Dommel, and/or Jason Germaine, in connection with the sale of the INVESTMENT CONTRACTS:

    a.    Rooms at Vista Cay and The Isles will rent for $250.00 to $350.00 per night;

    b.    The occupancy rate for Vista Cay and The Isles will be 79% or more;

    c.    The income projections for Vista Cay and The Isles are accurate;

    d.    Vista Cay and The Isles are the only rental/convention/resort property in all of Orange County zoned for short term rentals, providing a huge competitive advantage for maximization of rental income and resale values;

    e.    Vista Cay and The Isles units will appreciate significantly and will be able to be resold for a profit;

    f.    There is a shortage of accommodations for the current size of the convention center area, future demand for accommodations at Vista Cay and The Isles will continue to grow due to the close proximity to the Orlando International Airport, major theme parks, and the massive expansion of the Convention Center and the convention center area;

    g.    Monthly income from rentals will be high enough to cover mortgage and other expenses; and

    h.    The INVESTMENT CONTRACTS offered up to three years of effortless ownership and up to 36 months of no payments.

TAC ¶ 56. In the very next paragraph, the TAC alleges that each and every one of these MATERIAL MISREPRESENTATIONS was "material and false or misleading." The reasons for their materiality and falsity alleged are:

    a.    The use of inflated room rates without any basis in fact that artificially inflated the value of the investments to plaintiffs;

    b.    The use of high occupancy rates without any basis in fact that artificially inflated the value of the investments to plaintiffs;

    c.    the use of income projections that were fabricated and were not derived from properties substantially similar to the investments that artificially inflated the value of the investments to plaintiffs;

    d.    the claim that Vista Cay and The Isles was the only rental/convention/resort property in all of Orange County zoned for short term rentals which was not true, but if true would have provided a huge competitive advantage for maximization of rental income and resale values;

    e.    the claim that Vista Cay and The Isles units would appreciate significantly and could be resold for a profit which was false or recklessly so in light of the huge commissions, hefty "marketing fees" and "realtor bonuses" that inflated the cost of units;

f.  the claim that a shortage of accommodations for the current size of the convention center area plus future demand would drive increases in value which was purely speculative and artificially inflated the value of the investments to plaintiffs;

g.  the claim that monthly income from rentals will be high enough to cover mortgage and other expenses which was false and recklessly so because it failed to take into account the falsity of the other misrepresentations, as well as the possibility that OMC/MURPHY would discontinue its managerial/rental relationship, which it did;

h.  the claim that the INVESTMENT CONTRACTS offer up to three years of effortless ownership and up to 36 months of no payments which was false and recklessly so because it failed to take into account the falsity of the other misrepresentations above.

TAC ¶ 57.

The TAC continues in a similar fashion setting forth the "what" of the eight (8) OMISSIONS and four (4) FRAUDULENT PRACTICES. TAC ¶ 60-61. The TAC then explains, in detail, "why" the OMISSIONS were material, that PULTE's on-site sales agents Maria Richardson, Oliver Dommel, and/or Jason Germaine concealed each OMISSION from Plaintiff, and that Pulte owed Plaintiff a duty not to conceal the OMISSIONS under Section 718.506, Florida Statutes. TAC ¶ 62-66.

The TAC also makes allegations regarding "what" four (4) separate and specific "FRAUDULENT PRACTICES" Pulte engaged in with this Plaintiff in TAC ¶ 67-68. The TAC explains, in detail, "why" the FRAUDULENT PRACTICES were material, that PULTE's on-site sales agents Maria Richardson, Oliver Dommel, and/or Jason Germaine engaged in the FRAUDULENT PRACTICES, and that Pulte owed Plaintiff a duty not to engage in the FRAUDULENT PRACTICES under Section 718.506, Florida Statutes. TAC ¶ 69-72.

**b.  The Misrepresentations Were False When Made**

Contrary to Pulte's arguments in DE161 at 20, the MATERIAL MISREPRESENTATIONS alleged did not become false due to changed economic conditions or investor expectations. The MATERIAL MISREPRESENTATIONS were false when made, and each and every MATERIAL MISREPRESENTATION is alleged to be false or misleading because Pulte, its agents Wear/TWG, or OMC/Murphy, knew or should have known they were false when they made them.

For example, take the first two MATERIAL MISREPRESENTATIONS that "rooms at Vista Cay and The Isles will rent for $250.00 to $350.00 per night" and "the occupancy rate for Vista Cay and The Isles will be 79% or more." At the deposition of former defendant James J. Murphy on November 2, 2012, Mr. Murphy testified that these representations were based upon OMC's internal research "where our people would get on the phone once a week, starting on Mondays, and we could call to ask about rate and occupancy percentages: What's your average rate and what's your percentage?" Murphy Dep. 118:8-11. Mr. Murphy was then asked whether OMC based these projections on properties that were similar to Vista Cay so that they would be accurate by comparison.  He responded:

> A.   Well -- no.  We were trying to find out what our competitors had as -- because Vista Cay stood alone basically, because they were -- they had long-term leases; they had short-term leases; and they did not have – you know, they didn't have a restaurant on the property.  They didn't have a bar on the property.  They didn't have, you know, a playground, basically, on the property.  They had one pool for so many buildings, you know.  And -- or the indoor pool, outdoor pool was, you know.  Maid service.  A concierge floor.  I mean, these are all things that were in the area that we had to take into consideration to see where we were going to attack from a marketing standpoint, what area that we went after.  And we decided that we would go after who needed the area and who could get by on these limited services.  And it was decided -- excuse me -- that we would go after the main people that -- that are here, basically, two-thirds around the clock, and those are the people that set up shows.  So my people went out to sell.  In fact, we had two of the largest -- I don't know the names of them anymore -- of the largest companies that set shows up, that brings in guys that, you know, set up the booths and … bring in the advertising and set up their prep -- because our rate would fit with them and still give them an upgrade than what they would get at a hotel, basically.  Because they had, you know, a kitchen, and they -- instead of having one room for one guy, they could have -- they could sleep four men or four people and do cooking, you know.  And that would save money for their company.
>
> ***
>
> Q.  But there came a point where you arrived at a rental rate, a short-term rental rate, to charge for the various types of units, right?
>
> A.  We came up -- this was the high end.  When I'm looking at these numbers, the high end number for these projections. . . They took the numbers from the surrounding resorts and failed, in my opinion, to really look at what the amenity package that we were ending up with.

Murphy Dep. 118-121.  In fact, when shown the projections of "$250.00 to $350.00 per night," and advised that they were given to investors, Mr. Murphy testified that "at no given time was anybody supposed to or should or could tell any of the owners that they were going to be guaranteed, you know, $200 a night.  **That's pure bogus.**" Murphy Dep. 113:16-19.  The other MATERIAL MISREPRESENTATIONS suffer from the same defect, i.e. they were false (and bogus) when they were made to the plaintiffs.

The TAC explains, in detail, the "why," namely why each MATERIAL MISREPRE-SENTATION was false or misleading. TAC ¶ 57. The reason "why" is simply that the MATERIAL MISREPRESENTATIONS had no basis in fact and were false when made. There were no facts to support the claim that "rooms at Vista Cay and The Isles will rent for $250.00 to $350.00 per night," this was simply false. There were no facts to support the claim that "the occupancy rate for Vista Cay and The Isles will be 79% or more," this was simply false.  There were no facts to support the claim that "the income projections for Vista Cay and The Isles are accurate," this was simply false. There were no facts to support the claim that "Vista Cay and The Isles are the only rental/convention/resort property in all of Orange County zoned for short term rentals," this was simply false. There were no facts to support the claim that "Vista Cay and The Isles units will appreciate significantly and will be able to be resold for a profit," this was simply false. There were no facts to support the claims of "shortages of accommoda-tions," this was simply false. There were no facts to support the claim that "monthly income from rentals will be high enough to cover mortgage and other expenses," this was pure spec-ulation.

### c.   The "Bespeaks Caution" Doctrine Does Not Apply

The Eleventh Circuit held that "the whole transaction or scheme, including the other representations made by the defendants" must be considered. *Bamert v. Pulte Home Corp.*, 445 Fed. Appx. 256 at * 23 (11th Cir. 2011). Pulte, however, by invoking the "bespeaks caution" doctrine, asks the Court to consider only its purchase agreements and its purchase agree-ments alone.  The reason is obvious. Unlike the Eleventh Circuit, which defined the security to include "the whole transaction or scheme, including the other representations made by the defendants," the purchase agreements are narrow and full of disclaimers and cautionary statements. However, the Eleventh Circuit's holding requires a broad reading of the "whole transaction or scheme," not just the one-sided Pulte purchase agreements.

13

Viewing the "whole transaction or scheme" alleged in the TAC does not compel dismissal under the "bespeaks caution" doctrine. Reliance upon the disclaimers in the purchase agreements to negate the fraud engaged in by Pulte and its agents is like driving a car down I-4 at 90 miles per hour with a sign on the side that says "I AM NOT SPEEDING!" You will get a speeding ticket for your conduct regardless of the prominent disclaimer. Similarly, Pulte cannot disclaim its way out of liability by speaking fraudulently on one side of its mouth while cautioning against its own fraud on the other.

Furthermore, the "bespeaks caution" doctrine fails to take into account the duty owed to Plaintiff under Section 718.506, Florida Statutes, not to make the MATERIAL MISREPRESENTATIONS at all. Section 718.506, Florida Statutes, prohibits PULTE from publishing or making any material statement or information that is false or misleading in advertising and promotional materials, or to permit any third party to do so.  The TAC alleges that PULTE's authorized agents Maria Richardson, Oliver Dommel, and/or Jason Germaine knew about the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES, and their failure to speak and correct the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES rendered prior speech misleading or deceptive. TAC ¶¶ 58, 63, 66, 71. The TAC also alleges that WEAR, TWG and one or more authorized agents of PULTE including Maria Richardson, Oliver Dommel, and/or Jason Germaine, knew or should have known of the falsity of the MATERIAL MISREPRESENTATIONS, OMMISSIONS, and FRAUDULENT PRACTICES, and failed to invoke the "bespeaks caution" doctrine. The TAC further alleges that Pulte, Wear/TWG and OMC/Murphy failed to identify any forward looking statements as "forward looking" and failed to accompany such statements with meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statements. TAC ¶¶ 59, 70, 72.

Finally, this case bears no resemblance to *Garcia v. Santa Maria Resort, Inc.*, 528 F. Supp. 2d 1283 (S.D. Fla. 2007), cited by Pulte in DE 161 at 15. In *Garcia* only the purchase agreements were considered to be the security for securities fraud purposes. Here, the security is broader than the purchase agreements, and therefore the "bespeaks caution" doctrine cannot exonerate Pulte of its fraud.

**d. The TAC Does Not Engage in Group Pleading**

Pulte believes that the TAC is insufficient because in amounts to group pleading. Pulte has misread the TAC.

The group pleading doctrine in securities litigation "can be broadly characterized as a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b)." *Phillips v. Scientific Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004). The doctrine applies to cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1440 (9th Cir. 1987). "Under such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations." *Id. See also In re Solv-Ex Corp. Sec. Litig.*, 210 F. Supp. 2d 276, 283 (S.D.N.Y. 2000) ("Under the group pleading doctrine, Plaintiffs may rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company.")(quotation marks omitted); *In re Livent, Inc. Sec. Litig.*, 78 F. Supp. 2d 194, 219 (S.D.N.Y 1999) ("Group pleading doctrine . . . permits a plaintiff to allege that misstatements contained in company documents may be presumed to be the work of the company's officers and directors.") (quotation marks omitted).

Pulte is the only defendant in the TAC. The TAC alleges that Pulte is responsible for the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES that Pulte's employees made, or that were made by Wear/TWG, under common law principles of agency. Since Pulte is the only defendant, and since Plaintiff relies upon agency principles to hold Pulte responsible, there is no "group pleading" in the TAC.

Each and every one of the eight MATERIAL MISREPRESENTATIONS, eight OMISSIONS, and four FRAUDULENT PRACTICES, are derived from the text of internet websites, emails, brochures and flyers distributed by Wear/TWG set forth in Section V.B., and the text of the projections of profit made jointly by Wear/TWG and OMC/Murphy in Section V.C. The TAC alleges generally that the Plaintiff in this case received the MATERIAL MISREPRESENATIONS in emails, on the internet, in brochures or flyers. The TAC alleges generally that

the instant Plaintiff in this case was a victim of the OMISSIONS and FRAUDULENT PRAC-TICES in emails, on the internet, in brochures or flyers. These allegations represent "how" the fraud was perpetrated as to this specific plaintiff.

As to the "who, where and when" of the fraud, Section VIII of the TAC alleges the fol-lowing specific facts demonstrating "who" made the eight (8) MATERIAL MISREPRESEN-TATIONS to this specific plaintiff, "where" they were made and "when" they were made in the case at bar:

| Paragraph | Allegations |
|---|---|
| 110 | • Maria Richardson of PULTE acted as the agents of PULTE in making the MATERIAL MISREPRESENTATIONS to Plaintiff, BABY ROBERTA SOLIS BAMERT;<br>• WEAR first made the MATERIAL MISREPRESENTATIONS in a tele-phone conversation between WEAR and BAMERT approximately two months prior to April 19, 2007;<br>• Maria Richardson of PULTE repeated the MATERIAL MISREPRESEN-TATIONS in a telephone conversation approximately one month prior to April 19, 2007;<br>• During the April 19th telephone conversation Ms. Richardson remarked "nobody wants to make a mortgage payment," and Ms. Richardson also said that she (Richardson) wanted to purchase an INVESTMENT CON-TRACT herself;<br>• WEAR and TWG also made the MATERIAL MISREPRESENTATIONS to BAMERT by in an email BAMERT received on or about April 4, 2007 from Holly Follows of Bella Terra Realty;<br>• The email from Ms. Follows forwarded the TWG website, brochure, and marketing flyer containing the MATERIAL MISREPRESENTATIONS;<br>• The MATERIAL MISREPRESENTATIONS were repeated to BAMERT and her husband Mike Bamert by Ms. Richardson of PULTE in person at the PULTE sales office in July of 2007;<br>• The MATERIAL MISREPRESENTATIONS were made to BAMERT and Mike Bamert by MURPHY and Jessica Callow, a representative of TWG, on the premises of the Legacy Dunes development also in July of 2007;<br>• The MATERIAL MISREPRESENTATIONS were also made to BAMERT and her husband Mike Bamert by WEAR at various times before and af-ter April 19, 2007 on the internet at www.theweargroup.com.<br>• The MATERIAL MISREPRESENTATIONS were also made to BAMERT and her husband Mike Bamert by MURPHY at various times before and |

| Paragraph | Allegations |
|---|---|

after April 19, 2007 on the internet at www.omcstats.com.

### e.   The TAC Sufficiently Alleges that the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDLENT PRACTICES were Material

The test of materiality is whether there is a substantial likelihood that a reasonable investor would consider the omitted facts or misrepresentations important in deciding whether to invest. *TSC Indus. Inc. v. Northway, Inc.*, 426 U.S. 438 (1976). *See also, Kennedy v. Tallant*, 710 F.2d 711, 719 (11th Cir.1983); *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1323 (11th Cir.1982). Materiality is not a causation test. *Currie v. Cayman Resources Corp.*, 835 F.2d 780, 783 (11th Cir. 1988). Here, all the fraud was material to the plaintiff's decision whether or not to invest.

Section VI.E. alleges that this specific plaintiff relied upon the eight (8) MATERIAL MISREPRESENTATIONS, eight (8) OMISSIONS, and four (4) FRAUDULENT PRACTICES in connection with her securities purchase. TAC ¶ 86. The TAC alleges but/for causation, namely that plaintiff would not have purchased the INVESTMENT CONTRACT but for the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES. TAC ¶ 88. The TAC alleges that each and every one of these MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES was "material and false or misleading" and gives specific reasons. The TAC explains, in detail, why each MATERIAL MISREPRESENTATION was material, false or misleading. TAC ¶ 57. The TAC explains, in detail, why the OMISSIONS were material, false or misleading. TAC ¶ 65. The TAC explains, in detail, why the FRAUDULENT PRACTICES were material, false or misleading. TAC ¶ 69.

### f.   The TAC Sufficiently Alleges Scienter

The PSLRA requires pleading fraud giving rise to a strong inference of scienter. Facts set forth in a complaint may be aggregated to infer scienter. *Phillips v. Scientific Atlanta, Inc.*, 374 F.3d 1015 (11th Cir. 2004). The PSLRA requirement is met in the TAC.

The TAC alleges that at least six (6) separate PULTE employees had knowledge of the sale of the INVESTMENT CONTRACTS and the use of the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES, prior to and during the period of time when the Plaintiffs purchased the INVESTMENT CONTRACTS. TAC ¶ 74. Three (3) of the PULTE employees were regional vice presidents working in the PULTE regional office in Orlando. *Id*. These V.P. level executives met with WEAR and MURPHY at the PULTE region-

al office and discussed the INVESTMENT CONTRACTS and their terms prior to and during the period of time they were sold to Plaintiffs. *Id*. On November 16, 2006, Pulte on site sales representative Maria Richardson told another Plaintiff, DAN GRAVES, that WEAR spent several weeks talking with the "upper management" at PULTE's regional office about the INVESTMENT CONTRACTS, and PULTE management was aware that WEAR was selling units as an investment. *Id*.

The TAC goes on to allege facts that give rise to a strong inference of scienter. The TAC alleges that PULTE's on-site sales representatives Maria Richardson, Oliver Dommel, and Jason Germaine and three (3) regional vice president level PULTE managers were motivated to to sell as many INVESTMENT CONTRACTS as possible and make as much money as possible from the sales at as high a price as possible. TAC ¶ 79. The TAC also alleges, upon information and belief, that PULTE paid incentive compensation to its on-site sales representatives based upon the number of units sold and the price paid and therefore these sales reps had compelling profit motives to make the MATERIAL MISREPRESENTATIONS, OMMISSIONS, and FRAUDULENT PRACTICES. *Id*. The TAC also alleges the compelling profit motive behind sales by WEAR and TWG since they earned commissions on the sale of each INVESTMENT CONTRACT of over 15% as well as hefty "marketing fees" and "realtor bonus" fees, all of which were excessive as compared to normal commissions for sales of real estate. *Id*. Finally, the TAC alleges that the actions of all of PULTE's agents involved an extreme departure from the standards of ordinary care, and presented a danger of misleading Plaintiffs that was known to PULTE or was so obvious that PULTE must have been aware of it, something that was especially true for the three (3) regional vice president level PULTE managers involved. TAC ¶ 80.

These allegations, combined with all the other facts set forth in the TAC, are sufficient to impute the necessary knowledge to Pulte to satisfy the PSLRA. [2]

### g.   The TAC Sufficiently Alleges Reliance

Reliance "is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question." *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1448 (11th Cir. 1997)(internal quotation marks omitted).The TAC sufficiently alleges a causal connection

---

[2] As this Court has already noted, Plaintiff may allege scienter generally. DE 114 at 12-13.

between the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRAC-
TICES, and the Plaintiff's purchase or sale of a security. Section VI.E. and VIII allege these el-
ements with particularity:

| Sections | Allegations |
|----------|-------------|
| VI.E. | • Alleges reliance upon the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES by this plaintiff in connection with her securities purchase. |
| VIII. | • Alleges reliance upon the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES by this Plaintiff in connection with her securities purchase which were a cause of loss to Plaintiff. |

The TAC sufficiently alleges reliance upon the misrepresentation or omission by the
plaintiff.  As noted above, plaintiff has alleged a connection between the material misrepre-
sentation or omission and the purchase or sale of a security.

### h.  The TAC Sufficiently Alleges Economic Loss and Loss Causation

The TAC sufficiently alleges both damages and loss causation from the fraud. Loss
causation is "proof of a causal connection between the misrepresentation and the investment's
subsequent decline in value." *Meyer v. City of Southfield Fire & Police Retirement System*, 710
F.3d 1189, 1195 (11th Cir. 2013), *quoting Robbins v. Koger Props., Inc.,* 116 F.3d 1441, 1448 (11th
Cir. 1997). Ordinary pleading rules of Rule 8, Federal Rules of Civil Procedure, apply to
pleading loss causation and "it should not prove burdensome for a plaintiff who has suffered
an economic loss to provide a defendant with some indication of the loss and the causal con-
nection that the plaintiff has in mind." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347
(2005).

Economic loss and loss causation has been sufficiently alleged here. The plaintiff has
alleged that she was induced to purchase and did purchase the INVESTMENT CONTRACTS
based upon MATERIAL MISREPRESENATIONS, OMISSIONS, and FRAUDULENT PRAC-
TICES, and that but for the MATERIAL MISREPRESENTATIONS, OMISSIONS and
FRAUDULENT PRACTICES, she would not have purchased the INVESTMENT CON-
TRACTS. TAC ¶¶ 86-88. The TAC alleges that as a result of the fraud, plaintiff was forced to
begin making payments for mortgage, taxes, HOA dues and furniture leasing, as well as utili-
ty payments on each of the subject units as a result of OMC's cancelation of the rental agree-

ments. TAC ¶ 89. The TAC alleges that income plaintiff could be earned from rentals was significantly lower than represented. TAC ¶ 90. The TAC alleges that carrying costs were much higher than represented, and taxes were higher and not factored into the estimates of income. TAC ¶ 90.  The TAC alleges that plaintiff was forced to engage a new rental and property management service. TAC ¶ 92.  The TAC alleges plaintiff was forced to pay as much as $14,000 per unit for furniture, and then purchase replacement or upgraded furniture at additional cost. TAC ¶ 93.  The TAC alleges plaintiff stopped receiving guaranteed payments, her unit depreciated in value significantly, and she lost her investment, has been saddled with crushing debt she cannot pay, and faces foreclosure, economic hardship, possible bankruptcy, and destruction of her credit. TAC ¶¶ 94-96.  Finally, plaintiff alleges the loan she took out to purchase the INVESTMENT CONTRACTS have increased in cost due to interest rate adjustments being applied that continuously increase loan balances. TAC ¶ 97.

Plaintiff has alleged more than simply the mere possibility of loss causation. Plaintiff has linked her loss directly to the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES engaged in by Pulte directly or through their agents Wear/TWG. Plaintiff alleges she was induced to purchase an INVESTMENT CONTRACT by the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES, and that in reliance upon them she paid paid $356,560.00 for her unit. TAC ¶¶ 115-117.  Plaintiff alleges her unit has never had a fair market value of $356,560.00, and that the MATERIAL MISREPRESENTATIONS, OMISSIONS, and FRAUDULENT PRACTICES were a cause of loss to her. TAC ¶¶ 119-120.

This case is different from *Meyer*, cited by Pulte in DE 161 at 20.  *Meyer* was a "fraud on the market" theory case. In "fraud on the market" cases, plaintiffs may demonstrate loss causation by identifying a "'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud)." *Meyer*, 710 F.3d at 1196, *quoting FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1309-10 (11th Cir. 2011). The "corrective disclosure" is then linked to the plaintiff's loss to allege loss causation. *Meyer*, 710 F.3d at 1197.

Here there was no "corrective disclosure" to trigger loss causation. The trigger was the causal connection between the MATERIAL MISREPRESENTATIONS, OMISSIONS and FRAUDULENT PRACTICES which compelled the plaintiffs to purchase the INVESTMENT

CONTRACTS. In *Meyer*, the plaintiffs were unable to causally link their damages to the misrepresentations. The plaintiffs here can.

III.     **The Application of the Statute of Limitations is a Question of Fact**

"Dismissal under Federal Rule of Civil Procedure 12(b)(6) on statute of limitations grounds is appropriate only if it is apparent from the face of the complaint that the claim is time barred." *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 (11th Cir. 2005)(citations and quotations omitted). Plaintiffs do not bear the burden of negating the affirmative defense of the statute of limitations in their complaint. *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 846 (11th Cir. 2004).

In its Order dated August 10, 2012 affirming the R&R entered at DE 114, the District Court agreed with the Magistrate Judge that it was not apparent from the record whether any of Plaintiff's claims were time barred. DE 122 at 5. The District Court noted that "the date the parties executed the purchase agreements may **not** be the date Plaintiffs purchased the investment contracts." *Id*. (emphasis added). In light of the Eleventh Circuit's holding that Plaintiffs pled the existence of investment contracts broader than the purchase agreements, the District Court determined that Pulte had failed to show that Plaintiffs' claims for sale of unregistered securities were time barred.

Pulte has again failed to make that showing with respect to the TAC. The one year statute of limitations in 15 U.S.C. § 77m begins running upon the occurrence of the last pertinent activity prohibited by section 5(e) -- offer, sale, or delivery of the security. The "last pertinent activity" test is followed by courts in this circuit and elsewhere. *See Seale v. Miller*, 698 F. Supp. 883, 892 (N.D. Ga. 1988); *Folse v. Combined Equities*, 592 F. Supp. 559, 561 (W.D. La. 1984); *Bryant v. Uland*, 327 F. Supp. 439, 443-44 (S.D.Tex.1971).

a.     **The Statute of Limitations Does Not Accrue Until the Expiration of the One Year Holding Period**

The last pertinent activity in the sale of unregistered securities in this case must be decided on the facts, not the pleadings. Plaintiff submits the last pertinent activity is the expiration of the one year Holding Period for the condo/hotels at issue. The expiration of the one year Holding Period is the only date that makes sense "viewing the larger scheme through the lens of the representations made by The Wear Group, as Pulte's alleged agent, and the

rental agreements with OMC" as the Eleventh Circuit has instructed must be done in this case.

The "First Addendum to Contract for Purchase and Sale" provides that "Buyer will not transfer its rights under the Contract nor enter into any agreement for the sale or other transfer of the Unit that would prevent Buyer from holding fee simple title interest in the Unit, **from and after the date of Closing for a period of at least one (1) year (the 'Holding Period')**." *Bamert v. Pulte Home Corp.*, 445 Fed. Appx. 256 at * 9 (emphasis added). The Eleventh Circuit found this Holding Period to be particularly important to the issue of whether or not the plaintiffs' investment was the sale of an unregistered security. "[T]he only significant limitation specified in the purchase agreements themselves **is the one-year holding period**. In all other respects the agreements treat Plaintiffs as ordinary real estate purchasers. . . . Given the otherwise extensive control Plaintiffs enjoy under the agreements, we cannot say that the holding period alone would be sufficient to establish Howey's third prong." *Id.*, at * 18-19. (Emphasis added).

The test in *S.E.C. v. W.J. Howey Company*, 328 U.S. 293, 298-99 (1946), divides the elements of a security into three parts: (1) an investment of money, (2) a common enterprise, and (3) the expectation of profits to be derived solely from the efforts of others. *SEC v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1199 (11th Cir. 1999).The third prong asks whether the plaintiff had an expectation of profit solely from the efforts of others. Subsequent decisions interpreting Howey have generally rejected a literal interpretation of the word 'solely' in favor of a more realistic definition." *See S.E.C. v. Glenn W. Turner Enterprises, Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821 (1973). Thus, the test has become "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Id.*; *accord Williamson v. Tucker*, 645 F.2d 404 (5th Cir.), *cert denied*, 454 U.S. 897 (1981); *Waterman v. Alta Verde Industries, Inc.*, 643 F. Supp. 797, 800 (E.D.N.C. 1986), *aff'd* 833 F.2d 1006 (4th Cir. 1987). The Eleventh Circuit's decision interprets the third prong of *Howey* liberally, and this is consistent with the rule that the Federal security statutes are remedial and must be broadly construed. *See, e.g., Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111 (5th Cir.1980), *citing Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 131 (1972).

Viewing the larger scheme through the lens of the misrepresentations made to Plaintiffs, one sees that the sale of securities at issue is not complete until the expiration of the one year Holding Period. Resale of the investments could not occur until the one year Holding Period expired. Until the expiration of the one year Holding Period, the plaintiffs have not received the investment they purchased.  Their name may be on title to a condominium unit, but they can do nothing with that unit. The unit may be rented out by OMC, but they can realize no benefit from that rental since OMC retained all the benefits of renting out units pursuant to the scheme. Delivery of the security did not occur until one year had elapsed from the date of the closing because it was then, and only then, that the plaintiffs could exercise any of the rights or benefits of the security they had agreed to purchase especially, a key incident of ownership, namely, the right to sell the security. The economic benefits of the investment contracts sold plaintiffs were illusory until the one year Holding Period elapsed.[3]

Plaintiff Bamert closed on October 17, 2007, therefore her one year holding period expired October 17, 2008. This case was filed December 17, 2008. Consequently, this complaint was filed timely for statute of limitations purposes.

**b.** **Equitable Tolling Should Apply**

Plaintiffs submit that the allegations of the complaint, read with the required liberality, should permit the plaintiffs to prove, if necessary, that equitable tolling applies.

This case involves unsophisticated investors who did not realize that they were purchasing a security under *Howey*. It never occurred to plaintiffs here to inquire regarding registration at all. In this regard, this case is analogous to those where equitable tolling was applied because there was concealment of the fact that the securities were not registered. *See, e.g., In re National Mortg. Equity Corp. Mortg. Pool Certificates Sec. Litigation*, 636 F. Supp. 1138, 1166-67 (C.D. Cal. 1986); *Jones v. Lewis*, No. 86-1547-T, 1988 U.S. Dist. LEXIS 16807 *5-6 (D. Kan. June 13, 1988); *In re Gas Reclamation, Inc. Securities Litigation,* 659 F. Supp. 493, 507 (S.D.N.Y. 1987).  In such cases, the courts have required the plaintiff to plead why they did not know the securities should have been registered, when they first discovered registration

---

[3] Since the statute of limitations is an affirmative defense, Plaintiff did not plead the one year Holding Period in the TAC. However, it is known to Pulte and featured prominently in the Eleventh Circuit's decision in this case.

was required, what circumstances or events led to that discovery and why they did not dis-

cover those facts earlier. *National Mortg.*, 636 F. Supp. at 1167.

The TAC complies with this pleading requirement. The TAC alleges:

98.     At the time of their respective purchases, Plaintiffs were not aware that the INVESTMENT CONTRACTS in Vista Cay and The Isles they purchased could be considered securities. The Plaintiffs are not sophisticated investors. PULTE advised Plaintiffs that the INVESTMENT CONTRACTS were not securities. It did not occur to any Plaintiff to inquire about securities registration for the INVESTMENT CONTRACTS in Vista Cay and The Isles.

99.     PULTE concealed from Plaintiffs the fact that they were sold INVESTMENT CONTRACTS that constituted securities. PULTE affirmatively advised Plaintiffs that it was not responsible for any liability in connection with short term rentals at Vista Cay and The Isles. PULTE did so while simultaneously advising Plaintiffs that Vista Cay and The Isles were short term rental properties that promised economic benefits to investors like Plaintiffs.

100.     Plaintiffs discovered the falsity of the representations by Defendants no earlier than June 27, 2008 when OMC canceled the Exclusive Rental Management agreements. Without the benefit of the centralized management they were promised the Plaintiffs discovered that they would be forced to pay all costs of ownership of their units which was contrary to the INVESTMENT CONTRACTS they had purchased and what had been represented to them.

This case is different from *Temple v. Gorman*, 201 F. Supp. 2d 1238, 1242 (S.D. Fla. 2002) where there was no dispute that securities were sold without registration but in mistaken reliance on registration exemptions. Furthermore, the TAC alleges active concealment by Pulte that they were selling investment contracts that were securities. Under these circumstances, the motion to dismiss should be denied to permit the plaintiffs to demonstrate that, based upon the facts, equitable tolling applies to delay the running of the statute of limitations.

## IV.   <u>Conclusion</u>

Taken together, the allegations of the TAC allege a viable claim for securities fraud against Pulte based upon its own fraud and that of its agents Wear/TWG. "The federal securities statutes are remedial legislation and must be construed broadly, not technically and restrictively." *Paul F. Newton & Co.*, 630 F.2d at 1118, *citing Affiliated Ute Citizens of Utah v. US*, 408 U.S. 128, 151 (1972); and *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195 (1963).

Construing the prohibitions of the securities acts broadly effectuates congressional intent to protect investors. *Raiford v. Buslease, Inc.*, 825 F.2d 351, 354-5 (11th Cir. 1987). Construed liberally, the TAC complies with the requirements of Rule 9(b) and the PSLRA in all respects.

Furthermore, the TAC raises a genuine issue of fact regarding the accrual of the statute of limitations that brings the plaintiff's claim within the one year statute. Alternatively, even if the plaintiff's claim were beyond the one year statute, the plaintiff has sufficiently pled equitable tolling based upon concealment.

For these reasons, the Motion to Dismiss the TAC should be denied.

Dated: May 17, 2013                     Respectfully submitted,

                                        By: /Joel B. Rothman/
                                             Joel B. Rothman
                                             FL Bar No. 98220
                                             joel.rothman@sriplaw.com
                                             Jerold I. Schneider
                                             FL Bar No. 0026975
                                             jerold.schneider@sriplaw.com
                                             Schneider Rothman Intellectual
                                             Property Law Group PLLC
                                             P.O. Box 812182
                                             Boca Raton, FL 33481
                                             Tel. 561-404-4350
                                             Fax. 561-404-4353
                                             (Counsel for Plaintiffs)

and

Ronald S. Nisonson
Florida Bar No. 79405
Ward Damon
4420 Beacon Circle
West Palm Beach, Florida  33407
ron@warddamon.com
(Co-counsel for Plaintiffs)

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 17th day of May, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified.

By:     /Joel B. Rothman/
        Joel B. Rothman
        FL Bar No. 98220

<u>**SERVICE LIST**</u>

Jon M. Wilson jwilson@foley.com

Julie A. Angelini jangelini@foley.com

Foley & Lardner LLP

111 North Orange Avenue, Suite 1800

Orlando, Florida 32801-2386 *Attorneys*

*for Pulte Home Corporation*

**Method of Service:  CM/ECF**


Michael P. Matthews

mmatthews@foley.com

Foley & Lardner LLP

100 North Tampa Street, Suite 2700

Tampa, Florida 33601-3391

*Attorneys for Pulte Home Corporation*

<u>**Method of Service:  CM/ECF**</u>


Nancy J. Sennett, admitted pro hac

vice nsennett@foley.com

Foley & Lardner LLP

777 East Wisconsin Avenue Milwau-

kee, Wisconsin 53202-5306 *Attorneys*

*for Pulte Home Corporation*

**Method of Service:  CM/ECF**